IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Sharon Kay Maxwell,                  :
                  Plaintiff         :        Civil Action 2:12-cv-00207

       v.                              :        Judge Sargus

                             :        Magistrate Judge Abel
Commissioner of Social Security,
                  Defendant         :

**REPORT AND RECOMMENDATION**

Plaintiff Sharon Kay Maxwell brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying her applications for Social Security Disability and Supplemental Security Income benefits. This matter is before the Magistrate Judge for a report and recommendation on the parties' cross-motions for summary judgment.

**Summary of Issues.**

Plaintiff Sharon Kay Maxwell maintains she became disabled at age 49 by back pain, chronic obstructive pulmonary disease, sleep apnea, and psychological impairments. The administrative law judge found that Maxwell's psychological impairments were not severe and that her physical impairments permitted her to perform a reduced range of light work, including her former work as an office manager. (R. 17 and 23.) Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge failed to properly weigh the medical evidence; and,
- The administrative law judge erred by finding Maxwell's mental impairments were non-severe.

**Procedural History.**  Plaintiff Sharon Kay Maxwell filed her applications for supplemental security income benefits on November 18 and her application for social security disability insurance benefits on November 20, 2008, alleging that she became disabled on March 28, 2007, at age 49, by bipolar disorder, depression, fibromyalgia, and degenerative disc disease.  (R. 161-65 and 186.)  The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On December 9, 2010, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified.  (R. 31.)  A vocational expert also testified.  On March 11, 2011, the administrative law judge issued a decision finding that Maxwell was not disabled within the meaning of the Act.  (R. 24.)  On January 10, 2012, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 1-3.)

**Age, Education, and Work Experience.**  Sharon Kay Maxwell was born August 6, 1957.   (R. 161.) She has a high school education.  (R. 192.)  She has worked as a restaurant manager, office manager, and waitress.  She last worked in March 2007.  (R. 194.)

2

**Plaintiff's Testimony.**  The administrative law judge fairly summarized

Maxwell's testimony as follows:

> At the hearing, the claimant testified that she resides in a one story house with her granddaughter. The claimant denied that she has performed any work since 2007 and she denied that she has received any Worker's Compensation Benefits.

> The claimant testified that she is unable to work as a result of back pain that radiates down her leg and into her foot and toes. The claimant described her pain as "daily and constant." She described her back pain as "sharp" and she described her legs and feet as "numb." She stated that twice per week she is unable to get out of bed. Bending and walking long distances exacerbates her pain. She estimated that she is unable to lift and carry more than ten pounds.

> She estimated that she can sit for five to seven minutes at a time, stand for ten minutes at a time, and walk for a half block at a time. She testified that she has to use the restroom frequently, sometimes as often as two or three times per hour, and she attributes this urinary urgency to her back problem.

> The claimant testified that she typically sleeps four hours per night and that she uses continuous positive airway pressure (CPAP) while sleeping. She stated that she is prescribed the medication Adderall for narcolepsy.

> The claimant testified that she experiences fibromyalgia-related pain primarily in her neck and shoulders. Her pain causes her to experience difficulty with overhead reaching. She stated that she is prescribed Methadone for pain.

> The claimant testified that she experiences migraine headaches at the frequency of twice per week, which last for one to two days in duration. She stays in a dim lighted room and takes medication for her headaches.

> The claimant testified that she is prescribed inhalers for chronic obstructive pulmonary disease with asthma. Walking, climbing stairs, and talking exacerbates her shortness of breath.

3

> The claimant testified that she experiences migraine headaches at the frequency of twice per week, which last for one to two days in duration. She stays in a dim lighted room and takes medication for her headaches.

(R. 17-18.)

**Medical Evidence of Record.**  The administrative law judge's decision fairly sets out the relevant medical evidence of record.  Nonetheless, this Report and Recommendation will briefly summarize that evidence.

**Physical Impairments.**

An April 17, 2001 MRI of Maxwell's cervical spine revealed moderate central canal stenosis caused by central disc protrusion of the C4-5 which mildly to moderately deformed the central cord without definite cord signal abnormality. Mild central canal stenosis at C5-6 caused broad-based disc bulge. There was small central disc protrusion at C3-4 which deformed the central thecal sac without significant central canal or foraminal stenosis. (R. 428.)

<u>Matthew Vail, M.D.</u> Dr. Vail began treating plaintiff on April 25, 2005. Dr. Vail treated plaintiff for complaints of back pain and right arm weakness. (R. 425-26.)

On March 21 2007, plaintiff reported low back pain resulting from picking up a box at work. When she woke up in the morning, she had weakness in her arm. She had an antalgic gait.  She exhibited an exaggerated response to palpation of the right lower back area. Her DTRs were equal and bilateral in her lower extremities. In her right

4

upper extremity, she had wrist drop and was unable to extend her wrist. She could rotate her shoulders. (R. 455-56.)

On March 28, 2007, Dr. Vail noted that plaintiff was unable to straighten. Her movements were guarded, and she exhibited an exaggerated response to palpation. She had very flat, depressed affect. (R. 449-450.) On April 4, 2007, plaintiff was seen for back pain and right arm weakness. Her lower back pain was subsiding. Dr. Vail indicated that plaintiff's biggest problem was her right arm weakness. Her wrist flopped uncontrollably. Plaintiff walked with a normal gait. (R. 452-53.) On April 25, 2007, plaintiff reported continued back pain and persistent right arm weakness and pain. Dr. Vail diagnosed lumbar strain, herniated disc in the cervical spine, and fibromyalgia. Dr. Vail opined that plaintiff was unable to work. (R. 425-26.)

On June 13, 2007, Dr. Vail stated that plaintiff was off work. Plaintiff reported that her low back pain with sciatica had improved somewhat. Dr. Vail diagnosed acute lumbar strain, right sciatica, degenerative disc disease of the lumbar spine with foraminal encroachment. (R. 422-23.)

Following his examination on July 31, 2007, Dr. Vail completed a basic medical form for the Ohio Department of Job and Family Services. Plaintiff was diagnosed with neck and low back pain, right leg sciatica, fibromyalgia, depression, sleep apnea and hypertension. He indicated that his findings were supported by MRIs of the cervical and lumbar spine. He stated that as of July 31, plaintiff was severely limited in her ability to sit, stand or walk for any length of time. Maxwell was in constant pain and

required medications. Dr. Vail also indicated that plaintiff was markedly limited in her abilities to push, pull, bend, reach and handle. (R. 361-62.)

An October 15, 2008 MRI of Maxwell's lumbar spine showed evidence of degenerative disc disease at L3-4 and L4-5. She had broad-based disc bulging eccentric to the right at L4-5 resulting in right-sided foraminal narrowing. (R. 363.)

<u>Riverside Family Practice Center</u>. On December 21, 2006, Dr. Cholkeri treated plaintiff for follow up of chronic pain. She reported her right hip pain was a 6 on a ten-point scale.  In the past, Maxwell had taken Percocet, Tramadol, Vicodin, Oxycodone, and Kadian for pain. Dr. Cholkeri began treating plaintiff with oxycodone. (R. 430-33.) On January 16, 2007, plaintiff reported that her pain was the same. Dr. Cholkeri noted it was "[c]ontrolled with medications." (R. 434.) Plaintiff complained of pain at the top of her neck and the base of her skull that began four days before. Plaintiff exhibited tenderness to palpate of the paraspinal neck. Maxwell was diagnosed with a neck sprain/strain and encouraged to use ice. (R. 434-37.)

On February 20, 2007, plaintiff reported that her pain had been tolerable. Her pain had been an 8 on a ten-point scale. The pain had started getting worse 2-3 weeks ago. She had had pain turning her head. The pain went all the way down her shoulders. (R. 438-42.) On March 29, 2007, plaintiff complained of dysuria and numbness in her hips. Plaintiff reported that a recent EMG had been normal. She reported numbness in her foot. (R. 443-46.)

On March 30, 2007, plaintiff was seen by Jason Retzke, M.D. for problems with weakness in her right wrist. On examination, Maxwell had decreased range of motion of her right shoulder. She was unable to touch her opposing shoulder with her right arm. She had pain with extension of her shoulder over her head. She had tenderness to palpatation of right shoulder over the supraspinatus. Maxwell also had weakness of wrist extension/flexion, adduction of fingers, grasp, elbow flexion, and shoulder extension on right. She had decreased light touch sensation over fingers 1-4. She could occasionally move her wrist against gravity during the exam. She was unable to move past horizontal or maintain for more than several seconds while being examined. Dr. Retzke recommended that plaintiff have an MRI of her brain to evaluate whether the weakness was the result of a stroke. (Doc. 395-99.)

On April 10, 2007, Dr. Johnson noted that the plaintiff's MRI of her brain was negative. Dr. Johnson recommended that plaintiff have a repeat MRI of her spine to identify the source of weakness and numbness. (R. 400-04.) An April 17, 2007 MRI of plaintiff's lumbar spine revealed diffuse disc bulge eccentric to the right foraminal region at L4-L5 that resulted in moderate right foraminal stenosis, mild right lateral recess encroachment, and mild flattening of the central thecal sac. There was mild disc height loss and degenerative endplate changes at this level. Maxwell also had mild facet arthropathy at L5-S1 with patent central canal and foramen. Overall, the findings had not significantly changed since the August 24, 2005 MRI.  (R. 405-06.)

On April 17, 2007, plaintiff was seen by Vismai Cholkeri, M.D. for complaints of weakness and numbness in her right arm. Plaintiff described her pain as an 8 on a ten-point scale. Dr. Cholkeri referred plaintiff to neurosurgery for spinal canal stenosis. (R. 407-10.) On May 15, 2007, plaintiff saw Dr. Cholkeri for complaints of weight loss due to nausea and chronic pain. Plaintiff reported that she was going to have surgery on her neck. (R. 411-15.) On June 12, 2007. Dr. Cholkeri examined plaintiff for complaints of headache. (R. 416.) Plaintiff stated that she was scheduled to undergo injections. Dr. Cholkeri prescribed Vicodin, Oxycodone and Kadian. (R. 418.)

On June 12, 2007, Katie Coleman, M.D., a physician with Riverside Family Practice Center, began treating plaintiff. (R. 370.) On November 26, 2008, Dr. Coleman indicated that plaintiff's back pain was stable on her current medication regimen. There was no change in muscle weakness or numbness. She noted plaintiff was treated for a history of bipolar disorder, but plaintiff denied having manic symptoms. Despite her diagnosis of chronic obstructive pulmonary disorder, plaintiff continued to smoke. Plaintiff reported that she had pain in her right hip, which she rated as a 6 on a ten point scale. Plaintiff was diagnosed with degeneration of the lumbar/lumbosacral disc, chronic obstructive pulmonary disease, and depressive disorder, not otherwise specified.  (R. 364-68.)

Following this appointment, Dr. Coleman completed a form at the request of the Bureau of Disability Determination. Dr. Coleman noted that plaintiff was diagnosed with hypertension, GERD, fibromyaligia, hypertriglycerdemia, COPD, and

8

degenerative disk at L4-L5. Her findings included pain throughout the lower back on palpation. Plaintiff had no muscle weakness or sensory deficit. She noted plaintiff might benefit from epidural steroid injections. Maxwell was compliant with her medications and had responded well to them. Dr. Coleman opined that plaintiff could work at a sedentary desk job if she had breaks. She could not perform repetitive bending or lifting. Maxwell had no psychological impairment. She could walk and stand intermittently. (R. 370-71.)

On June 29, 2007, plaintiff complained of right-sided neck and face numbness. (R. 616.)

On August 21, 2007, plaintiff was seen by Dr. Coleman to follow up on her change to methadone. Her pain was not as controlled as it was on morphine. She had to use breakthrough medications. Plaintiff reported that she was denied Worker's Compensation. Her recent injection helped her numbness and pain significantly. (R. 662.)

In an October 17, 2007 letter, Dr. Coleman disagreed with Dr. Walter Hauser's assessment that plaintiff was a drug addict or that she was exhibiting drug-seeking behavior. Dr. Coleman stated that she had been treating plaintiff for her chronic back pain and fibromyalgia for the past year and that Maxwell had not exhibited any drug-seeking behavior. She also noted that plaintiff had been open to non-narcotic means of treating her pain and that she was currently treated with a long-acting pain medication. (R. 556.)

On October 17, 2007, plaintiff reported that the numbness in her legs had improved following spinal injections. She still required breakthrough medication. (R. 596.) On December 14, 2007, plaintiff reported that injections provided some relief. She continued to have pain in her right buttock and down the right leg. Her mood was okay. She was looking for a job and participating vocational rehabilitation. (R. 592.)

On February 4, 2008, plaintiff was described as doing pretty well. (R. 605.) On April 4, 2008, plaintiff indicated that she was looking for a job. (R. 587.) Plaintiff appeared alert and oriented with normal mood, affect, attention span and concentration. (R. 589.)

On August 1, 2008, plaintiff reported that she had some radiation of pain. Methadone controlled her pain, but she occasionally needed medication for breakthrough pain. (R. 579.) On physical examination, plaintiff was tender to palpation in her left lower back. She had an exaggerated pain response. She had pain in her shoulders. Sensation was diminished on the left middle lower leg. Dr. Coleman decreased plaintiff's oxycodone and indicated the need to obtain a drugs of abuse screening. (R. 581.) On August 29, 2008, plaintiff described her pain as tolerable and rated it a 6 on a ten point scale. (R. 574.) On November 26, 2008, Dr. Colemean noted that plaintiff's back pain was stable on her current medication regimen. There was no change in her muscle weakness or numbness. (R. 569.)  On January 22, 2009, Dr. Coleman noted that plaintiff's mood was okay without Seroquel, but plaintiff was unable to sleep. She rated her pain as a 7 on a ten-point scale. (R. 565.) An examination

10

revealed tenderness throughout the lumbar spine, a limping gait, and a flat affect. Dr.

Coleman diagnosed narcolepsy without cataplexy. (R. 567.)

On November 2, 2009, Jennifer Keswani, M.D., who first treated plaintiff

Maxwell in August 2005 and had been her primary care physician since 2008,

completed a multiple impairment questionnaire. (R. 709 and 793.) Dr. Keswani

diagnosed plaintiff with fibromyalgia, sleep apnea, back pain, narcolepsy,

temporomandibular joint disorder, depression, chronic obstructive pulmonary disorder,

and hyperglyceridemia, and hypertension. In response to the question asking her to

identify positive clinical findings, Dr. Keswani stated:

> Patient has tenderness to palpation low back, decreased muscle strength
> on the right side (4/5), neg[ative] straight leg raising, reflexes 2/4.
> Sensation affected [in the] L4/L5 area. Decreased range of motion arms
> bilaterally–cannot abduct more than 100 degress, 5/5 muscle strength
> upper extremities.

*Id.* Plaintiff had problems in daily functioning as a result of her back pain and

depression. Dr. Keswani also relied on a October 2009 MRI which showed broad based

disc bulging eccentric to the right at L4-L5 and right-sided foraminal narrowing.

Plaintiff's symptoms included back pain, leg pain, cervical spine tenderness, fatigue,

and weakness of lower extremities. Plaintiff's back pain radiated down her legs. She

experienced sharp pain that was worse with movement. (R. 710.) Her shoulder pain also

increased with movement. Dr. Keswani estimated plaintiff's pain as a 9 on a ten-point

scale and her fatigue was an 8 on a ten-point scale. Dr. Keswani opined that plaintiff

could sit 0-1 hours and stand/walk for 0-1 hours in an 8-hour day. (R. 711.) Plaintiff

11

could occasionally lift or carry 0-5 pounds. She could not constantly raise her arms above her head. (R. 712.) Maxwell was markedly limited in her abilities to grasp, turn, and twist objects; to use her fingers or hands for fine manipulations; or to use her arms for reaching.  Dr. Keswani further opined that plaintiff's symptoms would increase if she were placed in a competitive work environment.  (R. 713.) Plaintiff could only tolerate low stress based on her depression and anxiety. She experienced crying and depression. She was unable to get motivated. She was capable of low work stress. Plaintiff would required unscheduled breaks every 20 minutes for 5 minutes at a time. (R. 714.)

In a February 14, 2011 letter, Dr. Keswani noted that plaintiff had been diagnosed with chronic obstructive pulmonary disorder, fibromyalgia, sleep apnea, narcolepsy, temporomandibular joint disorder, hyperglyceridemia, hypertension, back pain, and depression. Positive clinical findings included tenderness to palpitation of the lower back, decreased muscle strength of the right side, decreased sensation of the L4-L5 area, and decreased range of motion fo the bilateral arms. Dr. Keswani stated that plaintiff's symptoms would increase if she were placed in a competitive work setting. (R. 793.)

Dr. Keswani opined that plaintiff could sit and stand or walk for no more than one hour in an 8-hour workday. Maxwell needed to frequently move around every twenty minutes for five minutes at a time. Maxwell could occasionally lift or carry up to 5 pounds. She had significant limitations in doing repetitive reaching, handling, fingering, and lifting. Maxwell was also markedly limited in grasping, turning, and

twisting objects, and performing fine manipulations. Maxwell's ability to work was also

limited by depression, anxiety, and lack of motivation. Maxwell also should not push,

pull, kneel, bend, or stoop on a sustained basis. *Id.*

James P. Fulop, M.D. On April 24, 2006, Dr. Fulop began treating plaintiff.

Maxwell reported that she had narcolepsy and was tired all the time. (R. 473-74.) On

May 13, 2006, Dr. Fulop informed plaintiff that her recent sleep study revealed that she

moderate obstructive sleep apnea. He recommended that she begin CPAP. (R. 472.) On

June 16, 2006, Dr. Fulop prescribed a CPAP for plaintiff. In a March 19, 2007 letter, Dr.

Fulop described Maxwell as having idiopathic hypersomnia, obstructive sleep apnea,

restless leg syndrome, and periodic limb movement disorder. Her quality of life was

greatly improved with her current medical regimen. (R. 466.)

Joseph Ruane, D.O. On March 14, 2007, Dr. Ruane met with plaintiff following an

EMG that showed no findings of lower extremity radiculitis/radiculopathy. Dr. Ruane

opined that plaintiff's pain was related to her fibromyalgia. Dr. Ruane noted that

plaintiff had significant tender points, but she did not have true trigger points according

to diagnostic criteria. There was some hyperalegesia and sensitivity consistent with

severe fibromyalgia. (R. 529.)

Michael Meager, M.D. On April 25, 2007, apparently at the request of Dr. Edward

T. Bope, Dr. Meager performed a consultative examination of Maxwell. On physical

examination, straight leg raising was positive on the left and negative on the right.

Maxwell had pain on internal and external rotation of the right hip. She was able to heel

13

and toe walk. Knee jerks were 2+. Ankle jerks were 1+. Sensory exam was normal. (R. 526-27.) After reviewing plaintiff's medical records, Dr. Meager believed some consideration of surgical intervention was appropriate and suggested she see Dr. Stephenson, a neurosurgeon, again. (R. 528.)

Sigurdur A. Stephensen, M.D. On May 15, 2007, Dr. Stephensen, a neurosurgeon, examined plaintiff for complaints of pain in her right leg from the hip down to the toes. She also had numbness in her right thigh. She complained of lower back pain and pain in the neck radiating into the right shoulder. She had weakness in her right wrist.She also complained of numb ness in her right arm. (R. 461.)

On examination, Dr. Stephensen found ratchety right-side weakness, including the arms and legs, but her muscle strength was otherwise normal. Sensation was normal. There was a "dramatic limping gait suggestive of a great deal of pain." Her bicep reflexes were 2+, bilaterally; and her triceps were 1+, bilaterally. Knee jerks were 2+, bilaterally. *Id.*

Dr. Stephensen found that Maxwell had back pain with right sciatica. He recommended physical therapy and referred her to Dr. Reddy for pain management. Given the nature of her symptoms and the relatively minor radiographic findings, Dr. Stephensen considered surgery as a very last resort. *Id.*

Yeshwant P. Reddy, M.D. On June 12, 2007, Dr. Reddy, a spine physiatrist and special in pain management, performed an initial evaluation of Maxwell for consideration of nonoperative treatment. Plaintiff reported neck and right arm that

14

increased with activity. She had poor sleep and was mildly depressed. On physical examination, flexion and extension were limited in her lumbar spine. Sensations were intact. Strength in the lower extremity was 5/5. Reflexes at the knee and ankle were 1/4 and symmetric. Straight leg raising test was unremarkable. Her hip, knee, and ankle examination were within normal limits. An MRI of the cervical spine showed moderate spinal stenosis at C4-5 due to a disc hernia. At C3-4 and C5-6, plaintiff had small disc bulges causing mild spinal stenosis. Dr. Reddy believed that epidural sterod injections would benefit Maxwell. (R. 518-19.)

<u>Walter Hauser, M.D.</u> On July 18, 2007, Dr. Hauser examined plaintiff, apparently in connection with a work place injury claim. (R. 383-87.) Maxwell complained of a March 12, 2007 work-related injury. Maxwell reported that she injured her back by picking up a box of copy paper weighing between 50-55 pounds. She immediately had pain in her low back, and she began experiencing neck pain a day or two later. Maxwell reported a history of fibromyalgia and right hip pain prior to the accident. (R. 383.)

Maxwell reported that her current symptoms were on her right side in her back, hip, leg, shoulder, and neck. She also had some numbness in her right upper leg and in her right ear. Examination of the cervical spine revealed some tenderness of the upper trapezius. She had 25% limitation of the cervical spine motion. Her shoulder motions were normal. She had no weakness, sensory loss or atrophy in the upper extremities; biceps, triceps and brachial radialis reflexes were equal and active.  Examination of her lumbar spine revealed some tenderness over the right greater trochanter. She had 25%

15

limitation of her lumbar spine motion. Straight leg raising was negative in the sitting position. In the supine position, she complained of back pain at 60 degrees. Her hip motions were normal. She had no weakness or sensory loss in her lower extremities. (R. 384.)

Dr. Hauser concluded that based on the March 9, 2007 examination by Dr. Ruane (during which Maxwell complained of significant low back pain, was somewhat unsteady on her feet, and could not rise from a chair without using her arms), it was unlikely plaintiff was able or willing to lift a 50-pound box of paper just three days later on March 12, 2007. He indicated that he questioned whether she had any work place injury at all and whether the injury was fabricated for purposes of compensation. Dr. Hauser further opined that plaintiff could have continued to work her sedentary job after March 27, 2007. (R. 385-87.)

Mark T. Finneran, M.D. In an April 15, 2008, Dr. Finneran outlined his findings following a medical record review, apparently in connection with a work place injury claim. He noted that Maxwell had a long history of chronic low back and right lower extremity pain with complications from other co-existing medical conditions. Her past history was significant for blood clots, depression, heart attack, angina, high blood pressure, mental illness, seizures and a suicide attempt. (R. 374-77.)

Dr. Finneran concluded that plaintiff's condition was not a direct result of her industrial claim. Her MRI showed typical, age-related degenerative changes. (R. 377.) He noted that plaintiff was treated with aggressive narcotics prior to her injury. There

16

was no change in her medical management post-injury. Maxwell had epidural steroid injections for right back and right leg pain in 2005 and in 2007. (R. 377-78.)

Leigh Thomas, M.D. On February 9, 2009, Dr. Thomas, a State agency reviewing physician, completed a physical residual functional capacity assessment.  (R. 505-12.) Dr. Thomas opined that plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. She could stand and/or walk for a total of at least 2 hours in an 8-hour day. She could sit for a total of about 6 hours in an 8-hour day. Her ability to push and or pull was unlimited. (R. 506.)

Dr. Thomas noted that plaintiff had no muscle weakness or sensory deficit. Maxwell was compliant and had a good response to her medications. There was no disc herniation. Plaintiff had giveaway ratchety weakness throughout her right side, including the arm and the leg. Otherwise, her strength was normal. Her sensation was normal except for decreased pin in the right thigh. She exhibited a dramatic limping gait suggestive of a great deal of pain. She had back pain with right sciatica. Her activities of daily living included doing laundry and dishes, dusting, caring for her grandchild, and shopping grocery stores. Plaintiff was limited to standing or walking for 15 minutes at a time for 4 hours total in an 8-hour day. Dr. Thomas opined that plaintiff could never climb ladders, ropes or scaffolds. She could occasionally stoop or crouch. (R. 506-07.)

On September 14, 2009, Gerald Klyop, M.D. he had reviewed the record and affirmed the February 9, 2009 residual functional capacity assessment as written. (R. 703.)

Peter R. Bachwich, M.D. In a January 12, 2011 letter, Dr. Bachwich described his examination of plaintiff based on a lung mass and abnormal chest CT scan. Plaintiff had a chronic cough, which had been worse for the past month or two. She coughed up to one third of a cup of yellowish to brownish sputum. She had some streaky hemptysis four to five times per week for the past month. She had exertional dyspnea walking as little as one half block. Dr. Bachwich identified a density in the left lung of uncertain etiology, which could be inflammatory and due to bacterial infection, fungal infection, mycobacterial infection, or sarcoidosis or scarring from a previous surgery.  He could not exclude the possibility of neoplastic density. (R. 768-70.)

**Psychological Impairments.**

Kevin Edwards, Ph.D. On January 20, 2009, Dr. Edwards, a State agency reviewing psychologist, completed a psychiatric review technique. His assessment was from March 28, 2007 through December 1, 2008.  He noted that plaintiff was diagnosed with depression. Plaintiff had no restriction of activities of daily living, no difficulties in maintaining social functioning, and no difficulties in maintaining concentration, persistence, or pace. She had no episodes of decompensation. Dr. Edwards noted that plaintiff stated her psychiatric conditions did not prevent her from being able to work. Plaintiff's treating source stated that plaintiff did not have any psychological

18

impairment. Plaintiff took Seroquel at night to help her with sleep for the past year. Plaintiff denied being depressed or experiencing manic symptoms. (R. 491-504.)

On August 6, 2009, Vicki Casterline, Ph.D. reviewed the January 20, 2009 assessment and concurred in the findings. (R. 702.)

Southeast, Inc. On February 26, 2010, Mike Unger, M.D., a psychiatrist, saw Maxwell on referral from Riverside Family Practice. She lived with her eldest son and a grand baby. She had Care Source Medicaid. (R. 745.)

Maxwell said she might have bipolar, might be depressed, and felt bad. Her symptoms of depression included decreased motivation, depressed mood, anhedonia, low energy. (R. 745.) Subjectively, Maxwill rated her mood as 5 on a scale of 1 to 10. In addition, she had fibromyalgia, sleep apnea, COPD (emphysema), and smoked 15-20 cigarettes a day. Dr. Unger diagnosed major depressive disorder, recurrent, severe without psychosis with postpartum onset. She also had an anxiety disorder. He noted that plaintiff's chronic pain was associated with both physical and psychological factors. He assigned a current GAF score of 43. (R. 746.)

On March 8, 2010, Dr. Unger revised his diagnosis and concluded that plaintiff had bipolar disorder, type I, recurrent, severe with a single episode of psychosis with postpartum onset, predominantly depressive symptoms. (R. 748-49.)

Beth Lutz, M.S.W., a licensed independent social worker completed a psychiatric impairment questionnaire. (R. 721-28.) Plaintiff was first seen on January 19, 2010, and her most recent visit with the psychiatrist had been March 8, 2010. Plaintiff was

19

diagnosed with bipolar disorder and alcohol dependence, not otherwise specified, in remission. She was assigned a Global Assessment of Functioning ("GAF") score of 45. (R. 721.) Plaintiff had poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, recurrent panic attacks, anhedonia, feelings of guilt or worthlessness, difficulty thinking or concentrating, social withdrawal, blunt, flat or inappropriate affect, decreased energy, intrusive recollections of a traumatic experience, generalized persistent anxiety, and hostility and irritability. (R. 722.) Plaintiff's primary symptoms were unstable mood, racing thoughts, anxiety, and depression. (R. 723.)

Plaintiff was mildly limited in her abilities to remember locations and work-like procedures and to understand and remember detailed instructions. She was mildly limited in her abilities to carry out detailed instructions and to work in coordination with or proximity to others without being distracted by them. She was moderately limited in her ability to maintain attention and concentration for extended periods. Plaintiff was markedly limited in her ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff was mildly limited in her abilities to accept instructions and respond appropriately to criticism from supervisors and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. She was also mildly limited in her ability to respond appropriately to changes in the work setting. (R. 724-25.)

Ms. Lutz indicated that plaintiff experienced anxiety and panic when faced with changes in her routine, causing her to withdraw. (R. 726.) Ms. Lutz further said that plaintiff's pain and mental health issues exacerbated the other. Plaintiff was only capable of tolerating low work stress. (R. 727.)

Dr. Rownak Ahmed, a psychiatrist at Southeast, Inc., began treating plaintiff on September 14, 2010 and had last seen her on December 1, 2010. (R. 736.) When Dr. Ahmed saw Maxwell on September 9, 2010, he conducted a mental status examination. Plaintiff had a stable mood and neutral affect. There was some somatic preoccupation. She was alert and oriented in three spheres. Her judgment and insight were limited. Dr. Ahmed did not think that Maxwell would do much better than her current state based on her multiple medical problems. (R. 751.) On December 1, 2010, plaintiff reported depression and crying spells. (R. 754.)

On December 6, 2010, Dr. Ahmed completed a psychiatric impairment questionnaire. He diagnosed bipolar disorder, a history of alcohol dependence, and schizoid personality disorder. He assigned a GAF score of 70. Her prognosis was guarded. (R. 736.) Dr Ahmed noted the following clinical findings: poor memory, sleep disturbance, mood disturbance, anhedonia, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, persistent irrational fears, generalized persistent anxiety, and somatization unexplained by organic disturbance. (R. 737.)

Dr. Ahmed concluded that plaintiff was moderately limited in her abilities to remember locations and work-like procedures and to understand and remember

21

detailed instructions. With respect to sustained concentration and persistence, plaintiff was moderately limited in her abilities to carry out simple one or two step instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance, to sustain an ordinary routine without supervision, and to make simple work related decisions. She was markedly limited in her abilities to carry out detailed instructions, to work in coordination with or proximity to others without being distracted by them, and to complete a normal workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. With respect to social interactions, plaintiff was moderately limited in her abilities to ask simple question or request assistance and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Plaintiff was markedly limited in her abilities to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. With respect to adaptation, plaintiff was moderately limited in her abilities to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to set realistic goals or make plans independently. (R. 739-41.)

Dr. Ahmed opined that plaintiff was incapable of even low stress work due to her ongoing depression and increased isolation. (R. 742.)

**Vocational testimony.** At the March 1, 2011 hearing, George W. Coleman III testified as a vocational expert. He said that Maxwell's prior work as an office manager at Riverside Hospital was semi-skilled work required light exertional demands. (R. 71.) Her job as a restaurant manager was skilled work having light exertional demands. (R. 71-72.) Rosenthal testified that given the administrative law judge's residual functional capacity finding, Maxwell could perform her previous work as an office manager. (R. 72.)

**Administrative Law Judge's Findings.**

1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2013.

2.   The claimant has not engaged in substantial gainful activity since March 28, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the severe impairment best described as (1) fibromyalgia, with associated back pain; (2) chronic obstructive pulmonary disease with asthma; and (3) obstructive sleep apnea (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry ten pounds frequently and 20 pounds occasionally, sit for six hours total, stand for two hours total, and walk for two hours total in an eight hour day. The claimant can occasionally stoop and crouch. She is precluded from climbing ladders, ropes, and scaffolding; working at unprotected heights; and working around hazardous machinery. This residual functional capacity is

consistent with the opinions of Dr. Thomas (Exhibit 8F) and Dr. Klyop (Exhibit 12F), and it is well-supported by the record as a whole.

6.      The claimant is capable of performing past relevant work as an office manager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from March 28, 2007, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(R. 12-23.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id.  LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**   Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge failed to properly weigh the medical evidence. The administrative law judge concluded that the opinion of Dr. Vail, plaintiff's treating occupational medical specialist, was not entitled to significant weight because he gave conflicting opinions about whether plaintiff could perform sedentary work. Plaintiff maintains that the inconsistency is irrelevant because even if she could perform sedentary work, she would be disabled based on the Medical Vocational Guidelines. The administrative law judge suggested that Dr. Vail may have been sympathetic to her claim. Plaintiff maintains that there is no evidence to support the assertion that Dr. Vail's opinion was the result of sympathy for plaintiff. Plaintiff argues that the administrative law judge failed to evaluate Dr. Vail's opinion under the factors outline in 20 C.F.R. § 404.1527(c)(2)-(6). The administrative law judge also rejected the opinion of Dr. Keswani on the basis that he did not provide clinical or objective findings and only relied upon plaintiff's subjective complaints. Plaintiff argues that Dr. Keswani specifically stated that her opinions were based upon clinical and objective medical findings, including tenderness of the low back, decreased muscle strength on the right side, impaired sensation in the L4-5 area,

decreased range of motion in both arms, and MRI findings of the lumbar spine. Plaintiff further argues that the administrative law judge improperly relied on the opinions of two non-examining sources who viewed an incomplete record. When Dr. Thomas reviewed plaintiff's file, it only contained a single report by Dr. Stephenson. Dr. Klyop affirmed Dr. Thomas's opinion without comment.

- <u>The administrative law judge erred by finding Maxwell's mental impairments were non-severe</u>. The non-examining psychologist, Kevin Edwards, Ph.D., reviewed plaintiff's file prior to the inclusion of the psychiatric treatment notes from Southeast Mental Health Center. Dr. Edwards indicated that plaintiff was not diagnosed with any mental condition. Plaintiff argues that the administrative law judge erred in rejecting the opinion of plaintiff's mental health treatment providers. The administrative law judge stated that Dr. Ahmed failed to provide any laboratory results, but mental impairments are not typically documented by lab tests. Plaintiff maintains that Dr. Ahmed relied upon appropriate psychiatric findings, and his opinion should have been given controlling weight. Plaintiff further argues that the opinion of plaintiff's social worker should not have been rejected outright. Opinions from non-acceptable medical sources should be considered in determining the severity of a claimant's impairment and how it affects her ability to do work.

26

**Analysis.**

Treating Doctors' Opinions.  Plaintiff argues that the Administrative Law Judge erred in rejecting the opinions of Drs. Vail and Keswani.

Treating Doctor: Legal Standard.  A treating doctor's opinion[1] on the issue of disability is entitled to greater weight than that of a physician who has examined plaintiff on only one occasion or who has merely conducted a paper review of the medical evidence of record.  20 C.F.R. § 404.1527(d)(1).  *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).  The Commissioner's regulations explain that Social Security generally gives more weight to a treating doctors' opinions because treators are usually "most able to provide a detailed, longitudinal picture" of the claimant's medical impairments. 20

---

[1]The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2). Treating sources often express more than one medical opinion, including "at least one diagnosis, a prognosis and an opinion about what the individual can still do." SSR 96-2p, 1996 WL 374188, at *2. When an administrative law judge fails to give a good reason for rejecting a treator's medical opinion, remand is required unless the failure does not ultimately affect the decision, *i.e.*, the error is *de minimus. Wilson*, 378 F.3d at 547. So reversible error is not committed where the treator's opinion "is patently deficient that the Commissioner could not possibly credit it;" the administrative law judge's findings credit the treator's opinion or makes findings consistent with it; or the decision meets the goal of 20 C.F.R. § 1527(d)(2) but does not technically meet all its requirements. *Id. See, Grayheart v. Commissioner of Social Security*, ___ F.3d ____, _____, 2013 WL 896255, *14 (6th Cir. March 12, 2013).

C.F.R. § 404.1527(d)(2).  When the treating doctor's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record" the Commissioner "will give it controlling weight. " *Id.*

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable." 42 U.S.C. §423(d)(1)(A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence. *Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975). 20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527(a)(1)[2].

---

[2]Section 404.157(a)(1) provides:
You can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See §404.1505. Your impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. See §404.1508.

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."  20 C.F.R. § 404.1527(d)(1).  When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).

When the treating source's opinion is well-supported by objective medical evidence and is not inconsistent with other substantial evidence, that ends the analysis. 20 C.F.R. § 404.1527(c)(2); Social Security Ruling 96-2p[3]. *Grayheart v. Commissioner of Social Security,* __ F.3d ____, _____, 2013 WL 896255, *9 and *10 (6th Cir. March 12, 2013). The Commissioner's regulations require decision-makers "to provide 'good reasons' for discounting the weight given to a treating-source opinion. [20 C.F.R.] § 404.1527(c)(2)."[4] *Grayheart,* above, __ F.3d at _____, 2013 WL 896255, *9.

The Commissioner has issued a policy statement, Social Security Ruling 92-6p, to guide decision-makers' assessment of treating-source opinion. It emphasizes:

_____

[3]Social Security Ruling 96-2p provides, in relevant part:

. . .

6.  If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.,* it must be adopted.

[4]Section 404.1527(c)(2) provides, in relevant part: "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator.

The focus at this step is solely on whether the treating-source opinion is well-supported by objective medical evidence and not inconsistent with other substantial evidence. In making this determination the factors for assessing the *weight* to give to the medical opinions of any medical source, 20 C.F.R. § 404.1527(c), are not used. These come into play only when there are good reasons not to give the treating-source opinion

controlling weight. 20 C.F.R. § 404.1527(c)(2)[5]; *Grayheart,* above, __ F.3d at _____,

2013 WL 896255, *10.

     If there are good reasons to find that the treating-source opinion is not

controlling, then the decision-maker turns to evaluating all the medical source evidence

and determining what weight to assign to each source, including the treating sources[6].

The Commissioner's regulations require the decision-maker to considers the length of

the relationship and frequency of examination; nature and extent of the treatment

---

[5]Section 404.1527(c)(2) provides, in relevant part:

  If we find that a treating source's opinion on the issue(s) of the nature and
severity of your impairment(s) is well-supported by medically acceptable
clinical and laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in your case record, we will give it
controlling weight. *When we do not give the treating source's opinion
controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and
(c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through
(c)(6) of this section in determining the weight to give the opinion*

(Emphasis added.)

[6]Even when the treating source-opinion is not controlling, it may carry sufficient
weight to be adopted by the Commissioner:

Adjudicators must remember that a finding that a treating source medical
opinion is not well-supported by medically acceptable clinical and labora-
tory diagnostic techniques or is inconsistent with the other substantial
evidence in the case record means only that the opinion is not entitled to
"controlling weight," not that the opinion should be rejected. Treating
source medical opinions are still entitled to deference and must be weigh-
ed using all of the factors provided in 20 CFR 404.1527 and 416.927. In
many cases, a treating source's medical opinion will be entitled to the
greatest weight and should be adopted, even if it does not meet the test for
controlling weight.

SSR 96-2p.

relationship; how well-supported the opinion is by medical signs and laboratory

findings; its consistency with the record as a whole; the treating source's specialization;

the source's familiarity with the Social Security program and understanding of its

evidentiary requirements; and the extent to which the source is familiar with other

information in the case record relevant to decision.  20 C.F.R. § 404.1527(c)(1) through

(6). Subject to these guidelines, the Commissioner is the one responsible for determining

whether a claimant is disabled.  20 C.F.R. § 404.1527(e).

The case law is consistent with the principals set out in Social Security Ruling 96-

2p.  A broad conclusory statement of a treating physician that his patient is disabled is

not controlling.  *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  For the treating

physician's opinion to have controlling weight it must have "sufficient data to support

the diagnosis."  *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th

Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).  The Commissioner may

reject the treating doctor's opinions when "good reasons are identified for not accepting

them."  *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); *Wilson v. Commissioner of Social

Security,* 378 F.3d 541, 544 (6th Cir. 2004).  Even when the Commissioner determines not

to give a treartor's opinion controlling weight, the decision-maker must evaluate the

treator's opinion using the factors set out in 20 C.F.R. § 404.1527(d)(2).  *Wilson,* 378 F.3d

at 544; *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009). There remains a rebuttable

presumption that the treating physician's opinion "is entitled to great deference." *Rogers

v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007); *Hensley,* above. The

Commissioner makes the final decision on the ultimate issue of disability. *Warner v. Commissioner of Social Security,* 375 F.3d at 390; *Walker v. Secretary of Health & Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

Treating Doctor: Discussion. With respect to the opinion of Dr. Vail, the administrative law judge stated:

> Dr. Vail's opinion has not been assigned significant weight because this opinion is inconsistent with the Dr. Vail's August 29, 2007 opinion (Exhibits 15E, page 9 and 3F, page 10), in which Dr. Vail contradictorily assessed that the claimant was capable of engaging in "sedentary work" (Exhibit 15E, page 9). Moreover, the possibility always exists that a doctor a doctor may express and opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's request and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in questions departs substantially from the rest of the evidence of record, as in the current case.

(R. 22.) The administrative law judge provided sufficient reasons for rejecting the opinion of Dr. Vail. The administrative law judge noted that Dr. Vail provided inconsistent opinions less than a month apart, and he failed to provide specific findings to support his opinion. The administrative law judge reviewed the record and noted that clinical findings were mostly characterized as mild. For example, Dr. Stephenson indicated that plaintiff's radiographic findings were consistent with Maxwell's age and

"minor." He concluded that any surgery should be considered only as a "very last

resort." (R. 14)(citing Exhibit 4F, page 5). Additionally, the more recent 2007 and 2008

MRIs were essentially unchanged from an earlier 2005 MRI. (R. 405.)

> With respect to Dr. Keswani's opinion, the administrative law judge stated:
>
> On November 2, 2009, Jennifer Keswani, M.D., assessed that the claimant's residual functional capacity was more restricted than the finding reached in this decision (Exhibit 14F). Dr. Keswani's assessment has not been assigned great weight because Dr. Keswani's report fails to substantiate the type of significant clinical and laboratory abnormalities that one would expect of the claimant were in fact disabled, and the doctor did not specifically address this weakness in [her] opinion. Moreover, it appears that Dr. Keswani relied quite heavily on the subjective reports of symptoms and limitations provided by the claimant, and that [s]he uncritically accept[s] as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exists good reason for questioning the reliability of the claimant's subjective complaints.

(R. 22.) The record contains substantial evidence to support the administrative law

judge's conclusion that Dr. Keswani's opinion was not supported by objective medical

evidence that would be expected to be present in the record if plaintiff were as impaired

as Dr. Keswani indicated. Findings on physical examination have been modest. Straight

leg raising has been negative. Examining physicians have found no or no significant

sensory loss or muscle weakness. The administrative law judge did not commit

reversible error when he gave greater weight to the opinions of the state agency

physicians who reviewed the medical record and provided opinions consistent with

and supported by the record.

34

Severe Impairment.  The Act provides that the Commissioner will determine a
claimant "to be under a disability only if his physical or mental impairment or
impairments are of such severity that he is not only unable to do his previous work but
cannot, considering his age, education and work experience engage in any other kind of
substantial gainful work which exists in the national economy . . . ."  42 U.S.C.
§423(d)(1)(A).  The Commissioner's regulations provide:

> If you do not have any impairment or combination of impairments
> which significantly limits your physical or mental ability to do basic
> work activities, we will find that you do not have a severe
> impairment, and are, therefore, not disabled.  We will not consider
> your age, education, and work experience.

20 C.F.R. §404.1520(c).

Repeating the language of the statute, the regulations provide that an
impairment is severe when it "significantly limits [the claimant's] physical or mental
ability to do basic work activities. . . . "  20 C.F.R. §404.1520(c).  Basic work activities
include:

> · "Physical functions such as walking, standing, sitting, lifting,
>   pushing, pulling, reaching, carrying, and handling."
> · "Capacities for seeing, hearing, and speaking."
> · "Understanding, carrying out, and remembering simple
>   instructions."
> · "Use of judgment."
> · "Responding appropriately to supervision, co-workers, and usual
>   work situations."
> · "Dealing with changes in a routine work setting."

20 C.F.R. §404.1521(b).  An impairment is not severe "only if it is a slight abnormality
which has such a minimal effect on the individual that it would not be expected to

interfere with the individual's ability to work, irrespective of age, education, or work experience." *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984); *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Murphy v. Heckler*, 801 F.2d 182, 185 (6th Cir. 1986); *Farris v. Secretary of Health and Human Services*, 773 F.2d 85, 89-90 (6th Cir. 1985).  This construction of §404.1520(c) is intended to insure that the Commissioner does not "deny meritorious disability claims without proper vocational analysis." *Higgs*, 880 F.2d at 862 (citation omitted).  The function of the severity requirement is to screen out claims that, based on the medical record, are totally groundless.  *Higgs*, 880 F.3d at 863; *Farris*, 773 F.2d at 90 n.1.

The administrative law judge stated:

> With regard to the claimant's allegations of a bipolar disorder, the objective evidence of record documents that as early as March 19, 2007, the claimant informed her treating doctor that she was "much better" on her current medication regimen and that her "quality of life had greatly improved" (Exhibit 6F, page 3) and that in July 2007, the claimant refused prescription psychotropic medications offered to her by her doctor (Exhibit 9F, page 99). In October 2009, it was again noted that the claimant refused treatment with psychotropic medications (Exhibit 15E, page 14), which suggests that the claimant was not experiencing psychologically based symptoms that resulted in significant limitation of functioning. Moreover, it is noted at numerous points throughout the record that the claimant continued to look [for work] through the period currently under adjudication (*see* e.g., Exhibits 15E, page 14 and 9F, page 75), which suggests that the claimant felt mentally capable of engaging in such activity. Furthermore, the record documents that the claimant did not seek professional mental health treatment until February 2010 (Exhibits 19F and 20F) and the record fails to document that the diagnosis on which this treatment was based lasted for a continuous period of at least 12 continuous months. Finally, as discussed above, the severity of the claimant's mental impairments has been measured by assessing limitations in his activities of daily living; social functioning;

36

> concentration, persistence or pace; and any episodes of decompensation of
> an extended duration (defined as at least two weeks). A careful review of
> these criteria establishes no disabling deficits of the claimant's mental
> functioning in any area (*see* discussion at page 7, *supra*). There is no
> credible evidence of record that establishes that the claimant has not had
> at all relevant times hereto, the ability to perform the basic mental
> demands of work, including the ability to understand, remember, and
> carry out instructions; use judgment; respond appropriately to
> supervisors, coworkers, and a usual work situation; and deal with
> changes in a routine work setting (Regulations 20 CFR 404.1521 and
> 416.921, and Social Security Ruling 85-15).

(R. 20-21.) The administrative law judge also correctly stated that Ms. Lutz was not a

medical source as defined in 20 C.F.R. §§ 404.1502, 404.1527(a)92), 416.902 and

416.927(a)(2), and her opinion is not entitled to controlling weight under Social Security

Ruling 96-2p. Nonetheless, the examining psychiatrists at Southeast, Inc., who had

treated plaintiff for more than a year when the administrative law judge issued his

decision, diagnosed depression, anxiety and bipolar disease. Dr. Ahmed found a

number of moderate and severe limitations related to plaintiff's ability to work.

Consequently, there is not substantial evidence supporting the administrative law

judge's finding that plaintiff's psychological impairments were not "severe" within the

meaning of 20 C.F.R. § 404.1520(c). Her psychological impairments are not " slight

abnormalites which have such a minimal effect on her that theyt would not be expected

to interfere with her ability to work. To what extent they do limit her ability to work is a

question for the administrative law judge on remand.

From a review of the record as a whole, I conclude that there is not substantial

evidence supporting the administrative law judge's decision denying that plaintiff's

psychological impairments are not "severe" within the meaning of 20 C.F.R. § 404.1520(c). Accordingly, it is **RECOMMENDED** that this action be **REMANDED** to the Commissioner for further proceedings to determine the extent of plaintiff's psychological limitations and there impact on her ability to perform unskilled work having light exertional demands. It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **GRANTED** to the extent that it may seek the recommended remand and that defendant's motion for summary judgment be **DENIED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).


                                          s/Mark R.  Abel_____
                                         United States Magistrate Judge

38